THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| GLORIA I. COPPOCK,<br><br>                    Plaintiff,<br><br>          v.<br><br>CITIGROUP, INC., CITIBANK, N.A.,<br>successor in interest to Citibank (South<br>Dakota), N.A., DOES 1-10 and<br>COLLECTION AGENTS 1-10,<br><br>                    Defendants. | CASE NO. C11-1984-JCC<br><br>ORDER GRANTING<br>DEFENDANTS' MOTION TO<br>COMPEL ARBITRATION AND<br>DENYING PLAINTIFF'S MOTION<br>TO COMPEL DISCOVERY |

This matter comes before the Court on Defendants Citigroup, Inc.'s and Citibank, N.A.'s ("Citi's") motion to compel arbitration and stay this action pending arbitration (Dkt. No. 43) and Plaintiff Gloria Coppock's motion to compel discovery (Dkt. No. 55). Having thoroughly considered the parties' briefing[1] and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS Defendants' motion to compel arbitration (Dkt. No. 43) and denies Coppock's motion to compel discovery (Dkt. No. 55) for the reasons explained herein.

---

[1] This case represents the second time a federal district court has considered—and rejected—Plaintiff's arguments. That is because Plaintiff's attorneys lifted almost all of her brief—and almost verbatim—from the brief filed by the plaintiffs in *Cayanan v. Citi Holdings, Inc.*, No. 12–CV–1476–MMA(JMA), --- F. Supp. 2d ----, 2013 WL 784662 (S.D. Cal. Mar. 1, 2013). *See* Plaintiffs' Opposition to Motion of Defendants to Compel Arbitration and Stay Action (Dkt. No. 20), *Cayanan* (Dec. 3, 2012).

1   **I.      BACKGROUND**

2           This is a putative class action asserting violations of the Telephone Consumer Protection

3   Act ("TCPA"), the Fair Debt Collection Practices Act ("FDCPA"), and Washington's Consumer

4   Protection Act ("CPA"). (Dkt. No. 40 § III.) Coppock alleges that, "on ten to fifteen occasions,

5   [Citi] . . . plac[ed] calls to [her] cellular telephone" using "'automatic telephone dialing

6   equipment,' including predictive dialer equipment," "in order to collect a debt allegedly owed

7   by" her under her Citi credit card. (*Id.* at 3–4 ¶¶ 2.3, 2.5.) Citi moves to compel arbitration of

8   Coppock's claims.

9           Coppock opened a credit card account with Citi in 1994. (*Id.* ¶ 7.) The card agreement

10  governing the account authorized Citi to change the terms of the agreement at any time, with

11  changes binding on the card holder. (Dkt. No. 44 Exs. 1 at 5, 9 at 2, 12 at 10, 15 at 12.) In

12  October 2001, Citi mailed its card holders, including Coppock, a "Notice of Change in Terms

13  Regarding Binding Arbitration to Your Citibank Card Agreement." (Dkt. No. 44 ¶¶ 10–11, 13–

14  16 & Exs. 2 & 5.) Coppock's October and November 2001 billing statements also included

15  messages in all-capital letters alerting Coppock to the notice of change in terms. (*Id.* ¶¶ 11–12 &

16  Ex. 3–4.) The notice added to the card agreement an arbitration agreement allowing either party

17  to demand individual (non-class) arbitration. (*Id.* Ex. 2.) It further provided:

18          If you do not wish to accept the binding arbitration provision contained in this
19          change in terms notice, you must notify us in writing within 26 days after the
            Statement/Closing date indicated on your November 2001 billing statement
20          stating your non acceptance . . . . If you notify us by that time that you do not
            accept the binding arbitration provisions contained in this change in terms notice,
21          you can continue to use your card(s) under your existing terms until the end of
            your current membership year or the expiration date on your card(s), whichever is
22          later. At that time your account will be closed and you will be able to pay off your
23          remaining balance under your existing terms.

24  (*Id.* ¶ 17 & Ex. 2 at 5.) Coppock did not contact Citi to reject the arbitration provision. (*Id.*

25  ¶¶ 18–19 & Ex. 6.) Citi sent another notice of change in terms, making certain amendments to

26  the arbitration agreement, in 2005, and again alerted Coppock to the notice in her billing

1    statement and gave her the option of opting out of the changes. (*Id.* ¶ 21 & Exs. 7–8.) Citi sent

2    Coppock several subsequent card agreements, all of which contained the arbitration agreement.

3    (*Id.* ¶¶ 22–30, Exs. 9–10, 12–13, 15–16.) Coppock continued to use her Citi credit card following

4    receipt of these agreements, until shortly after she began receiving the phone calls from Citi at

5    issue in this case. (*Id.* ¶¶ 24, 27, 30; Dkt. No. 40 at 3 ¶ 2.4.)

6    **II.    DISCUSSION**

7            The Federal Arbitration Act ("FAA") provides that arbitration agreements "shall be valid,

8    irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

9    revocation of any contract." 9 U.S.C. § 2. In deciding a motion to compel arbitration, a court's

10   role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2)

11   whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic*

12   *Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). The court applies a summary judgment-like

13   standard to factual disputes. *Concat LP v. Unilever*, PLC, 350 F. Supp. 2d 796, 804 (N.D. Cal.

14   2004).

15        **A.    Whether A Valid Arbitration Agreement Exists**

16            **1.    Choice Of Law**

17            "[A] federal court sitting in diversity applies the conflict-of-law rules of the state in

18   which it sits," but where jurisdiction is based on the existence of a federal question, "federal

19   common law applies to the choice-of-law rule determination." *Daugherty v. Experian Info.*

20   *Solutions, Inc.*, 847 F. Supp. 2d 1189, 1194 (N.D. Cal. 2012) (quoting *Schoenberg v.*

21   *Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 782 (9th Cir. 1991)). This Court has jurisdiction

22   over Coppock's complaint under both 28 U.S.C. §§ 1331 and 1367(a) (federal question and

23   supplemental jurisdiction) and 1332(a) (diversity jurisdiction). Both Washington and the federal

24   common law follow the Restatement (Second) of Conflict of Laws. *Daugherty*, 847 F. Supp. 2d

25   at 1194; *Erwin v. Cotter Health Ctrs.*, 167 P.3d 1112, 1121 (Wash. 2007). Restatement § 187(2)

26   provides:

1

2

The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless either

3

4

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

5

6

7

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Coppock's card agreement with Citi provides that "[t]he terms and enforcement of this Agreement shall be governed by federal law and the law of South Dakota, where we are located." (Dkt. No. 44 Exs. 1 at 5, 9 at 2, 12 at 10, 15 at 16.) Coppock asserts that, notwithstanding this forum selection clause, Washington law applies. The only argument she makes in support is that, under Restatement § 188, Washington would be the state of the applicable law in the absence of the forum selection clause. (Dkt. No. 47 at 9.) But even if Coppock were correct, in order for Washington law to apply under § 187(2)(b), South Dakota law would have to contravene a fundamental policy of Washington, and Washington would have to have a materially greater interest than South Dakota in determining whether Coppock agreed to the arbitration provisions. Coppock has argued nothing to that effect. And nor does the exception in § 187(2)(a) apply. South Dakota has a substantial relationship to Citi: The card agreement provides that South Dakota is "where we [Citi Defendants] are located" (Dkt. No. 44 Exs. 1 at 5, 9 at 2, 12 at 10, 15 at 16), and thus there is a "reasonable basis for the parties' choice" of South Dakota. Restatement § 187(2)(a). The Court thus applies South Dakota law. *See, e.g.*, *Daugherty*, 847 F. Supp. 2d at 1195 (applying South Dakota law "to resolve the question of whether the arbitration provision is valid," where Citi card holder "has not argued, let alone established that South Dakota law is contrary to a fundamental policy of . . . California"); *Guerrero v. Equifax Credit Info. Servs., Inc.*, No. CV 11–6555 PSG (PLAx), 2012 WL 7683512, at *6 (C.D. Cal. Feb. 24, 2012) (applying South Dakota law to resolve question of whether Citi

card holder "entered into the arbitration agreement when he was mailed the 2001 Change–in–Terms, failed to take advantage of the optout provision, and continued to use the card").

Coppock confusingly cites to a case in which there was a "chicken and egg" problem in deciding which state's law applied—because the parties disputed whether the plaintiff had ever agreed to the contract that contained the forum selection clause in the first place—and in which the court concluded it did not need to decide which state's law governed because the outcome was the same under both. *Nguyen v. Barnes & Noble, Inc.*, No. 8:12–cv–0812–JST (RNBx), 2012 WL 3711081, at *3 & n.3 (C.D. Cal. Aug. 28, 2012). Coppock says that here, as in *Nguyen*, "application of South Dakota law 'stems from the as-yet-undetermined proposition that [the] parties agreed to [Citi's] Terms of Use[,]' a question the Court need not decide now: . . . 'the validity of the arbitration provision[] does not hinge on whether [Washington] or [South Dakota] law applies.'" (Dkt. No. 47 at 13 (quoting *Nguyen*, 2012 WL 3711081, at *3).) But there is no "chicken and egg" problem here as there was in *Nguyen*, since the forum selection clause here is in the card agreement—which undisputedly governs Coppock's account—not the arbitration agreement. Equally off-point is Coppock's citation to an inapposite case involving an "agreement [that was] *ambiguous* concerning whether English [or U.S.] law . . . applie[d] . . . ." *Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 921 (9th Cir. 2011) (emphasis added). Unlike in *Cape Flattery*, here, the agreement clearly provides for the application of South Dakota law, and Coppock has not shown that an exception to the general rule applying the law of the contractually-chosen state applies.

## 2.   Analysis

"The party seeking to enforce an arbitration agreement bears the burden of showing that the agreement exists and that its terms bind the other party." *Gelow v. Cent. Pac. Mortg. Corp.*, 560 F. Supp. 2d 972, 978 (E.D. Cal. 2008) (citing *Sanford v. Memberworks, Inc.*, 483 F.3d 956, 962 (9th Cir. 2007), and *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1139–41 (9th Cir. 1991)). "This burden is a substantial one[.]" *Id.* at 979. "Before a party to a

1   lawsuit can be ordered to arbitrate . . . , there should be an express, unequivocal agreement to

2   that effect . . . The district court . . . should give to the opposing party the benefit of all

3   reasonable doubts and inferences that may arise." *Three Valleys*, 925 F.2d at 1141.

4          In October 2001, the South Dakota statute on modification of credit card agreements

5   provided:

> 6          Upon written notice, a credit card issuer may change the terms of any credit card
> 7          agreement, if such right of amendment has been reserved, . . . so long as the card
> 8          holder does not, within twenty-five days of the effective date of the change,
>            furnish written notice to the issuer that he does not agree to abide by such
> 9          changes. . . . Use of the card after the effective date of the change of terms . . . is
> 10         deemed to be an acceptance of the new terms, even though the twenty-five days
>            have not expired.

11   S.D. Codified Laws § 54-11-10 (2001); *see Cayanan*, 2013 WL 784662, at *12 ("[U]nder South

12   Dakota law, an agreement to arbitrate exists between [plaintiff] and Defendants if [plaintiff]

13   continued to use her credit account after she received the 'bill stuffer' notices."). The statute

14   governing the creation of a contract between a card holder and an issuer further provided:

> 15         The use of an accepted credit card or the issuance of a credit card agreement and
> 16         the expiration of thirty days from the date of issuance without written notice from
>            a card holder to cancel the account creates a binding contract between the card
> 17         holder and the card issuer with reference to any accepted credit card, and any
> 18         charges made with the authorization of the primary card holder.

19   S.D. Codified Laws § 54-11-9 (2001).

20          Here, consistent with the terms of the card agreement, Citi notified Coppock that it was

21   adding the arbitration agreement to the card agreement effective November 2001. Coppock did

22   not notify Citi that she did not agree to abide by the changes, and she continued to use her card.

23   Moreover, she received at least three more complete card agreements that incorporated the

24   arbitration agreement, did not opt out, and continued to use her card. By her actions, under South

25   Dakota law, Coppock assented to the terms of the arbitration agreement. *See, e.g.*, *Daugherty*,

26   847 F. Supp. 2d at 1195–96 & n.5 (2006 Citi change in terms validly amended card agreement);

ORDER
PAGE - 6

1   *Cayanan*, 2013 WL 784662, at *12 (holding, under South Dakota law, that plaintiff "assented to

2   arbitration when she continued to use her [Citi] Thank You Card account after receiving change-

3   of-terms notices and failed to opt out of the changed terms"); *Guerrero*, 2012 WL 7683512, at *6

4   ("Applying South Dakota law, the Court finds that Plaintiff entered into the arbitration

5   agreement when he was mailed the 2001 Change–in–Terms, failed to take advantage of the

6   optout provision, and continued to use the card."); *Ackerberg v. Citicorp USA, Inc.*, No. C 12–

7   03484 SI, --- F. Supp. 2d ----, 2012 WL 4932618, at *3 (N.D. Cal. Oct. 16, 2012) (collecting

8   "[n]umerous" cases in which "courts have found that continued use or failure to opt out of a card

9   account after the issuer provides a change in terms, including an arbitration agreement, evidences

10  the cardholder's acceptance of those terms"). Coppock cites to a slew of cases applying other

11  states' laws, or concerning changes in terms that gave card holders effectively no ability to opt

12  out. Those cases do nothing to call into question the effectiveness of the notice of change in

13  terms, Coppock's failure to opt out, and her continued use of her card to bind her to the

14  arbitration clause under South Dakota law.

15          Coppock objects that "Citibank d[id] not produce with its Motion the agreement it claims

16  was entered into by Ms. Coppock in 1994," when Coppock opened the account. (Dkt. No. 47 at

17  5.) But the relevant agreement is the one in effect in October 2001, when Citi added the

18  arbitration clause to it, since the issue here is whether that addition was a valid amendment to the

19  agreement. Coppock has produced no evidence that the 2001 agreement (an exemplar of which

20  Citi submitted with its motion (Dkt. No. 44 Ex. 1)) is *not* the agreement that governed her

21  account in October 2001. Coppock also states that she does not recall "entering into an

22  arbitration agreement with Citibank," "reading any documents from Citibank informing [her]

23  that [she] was to be bound by an arbitration agreement," or receiving the 2001, 2005, 2006, or

24  2009 card agreement or the 2001 or 2005 change in terms. (Dkt. No. 49 ¶¶ 10–11.) Coppock's

25  failure to recall does not create a genuine issue of fact as to whether she received the notice of

26  change in terms and subsequent card agreements and whether by her actions she assented to

those terms. *See Grabowski v. Robinson*, 817 F. Supp. 2d 1159, 1168 (S.D. Cal. 2011); *see, e.g.*, *Cayanan*, 2013 WL 784662, at *21 n.10 ("the mere assertion that [plaintiff] did not receive the[] [notice of change in terms] is insufficient to establish this fact without additional evidence"); *Daugherty*, 847 F. Supp. 2d at 1196.

## B.   Whether The Arbitration Agreement Encompasses Coppock's Claims

"[A]n order to arbitrate . . . should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT & T Techs., Inc. v. Comm'cns Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582–83 (1960)); *see Warrior & Gulf*, 363 U.S. at 584–85 ("In the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail . . . ."). The party resisting arbitration bears the burden of showing that the agreement does not cover the claims at issue. *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000).

Coppock argues that her TCPA and FDCPA claims are outside the scope of the arbitration agreement. The agreement provides:

> All [c]laims relating to your account, a prior related account, or our relationship are subject to arbitration . . . , no matter what legal theory they are based on or what remedy . . . they seek. This includes [c]laims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law . . . .

(Dkt. No. 44 Exs. 2 at 2–3, 9 at 4, 12 at 8, 15 at 14.) The arbitration agreement clearly covers the TCPA and FDCPA claims. Citi made the calls to collect a debt it thought Coppock owed on her credit card account. Her claims based on those calls are thus "[c]laims relating to [her] account . . . or [her and Citi's] relationship." *See Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983) ("'relating to this agreement' [is] . . . broad arbitration clause" language) (quotation marks omitted). That Citi may have mistakenly believed that Coppock's

1    account was in arrears does not change the fact that the collection call was related to the account.

2    Indeed, Citi allegedly stopped calling Coppock after she transferred her outstanding balance to a

3    different credit card company. (Dkt. No. 40 at 3 ¶ 2.4.) That only reinforces the conclusion that

4    the calls were related to her account and her relationship with Citi.

5          The cases to which Coppock cites are distinguishable. In *In re Jiffy Lube International,*

6    *Inc., Text Spam Litigation*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012), the court held that an

7    arbitration agreement purporting to subject "any and all disputes" between Jiffy Lube and the

8    plaintiff—"not limited to disputes arising from or related to the transaction or contract at

9    issue"—was unconscionable because it would render "a tort action arising from a completely

10   separate incident [subject to] arbitration." *Id.* at 1262–63. The arbitration agreement here is not

11   so unconscionably unlimited; it applies only to claims "relating to your account, a prior related

12   account, or our relationship." *Smith v. Steinkamp*, 318 F.3d 775 (7th Cir. 2003), is

13   distinguishable for the same reason. *See id.* at 777–78. And *Jiffy Lube* is further distinguishable

14   in that the text message Jiffy Lube sent to the plaintiff in that case was a proactive marketing

15   message offering a discount on future Jiffy Lube services—*i.e.*, a message not related in any way

16   to the contract the plaintiff had previously signed when he visited one of Jiffy Lube's locations

17   for an oil change. *Jiffy Lube*, 847 F. Supp. 2d at 1263. By contrast, here, the phone calls were

18   clearly related to Coppock's card account. *See, e.g.*, *Cayanan*, 2013 WL 784662, at *20 (calls

19   made to plaintiffs "because Plaintiffs had failed to make timely payments on their accounts,"

20   "for the limited purpose of collecting money owed them," and "not . . . for advertising,

21   marketing, or other purposes unrelated to the accounts," were "'related to' the delinquent credit

22   accounts" and thus TCPA claims based on those calls were covered by Citi arbitration clause.)

23         *Cape Flattery*, *Mediterranean Enterprises*, and *Tracer Research Corp. v. National*

24   *Environmental Services Co.*, 42 F.3d 1292 (9th Cir. 1994), are also off-point. Those cases dealt

25   with agreements mandating arbitration of disputes "arising under" the agreement, which the

26   Ninth Circuit interpreted to mean "relating to the interpretation and performance of the contract

itself." *Cape Flattery*, 647 F.3d at 924 (quotation marks omitted); *see Mediterranean Enters.*, 708 F.2d at 1463–64 ("'arising under' is narrower in scope than the phrase 'arising out of or relating to'" and is "relatively narrow as arbitration clauses go") (quotation marks omitted); *Tracer*, 42 F.3d at 1295 ("The 'arising out of' language is of the same limited scope as the 'arising under' language in *Mediterranean Enterprises*."). Nor is *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511 (10th Cir. 1995), relevant. In that case, involving an arbitration clause that subjected to arbitration "[a]ny dispute arising in connection with the implementation, interpretation or enforcement of this Agreement," the court held merely that the plaintiff's "claims that d[id] not implicate the contract [we]re litigable." *Id.* at 1513, 1516. Coppock appears to believe that, "with respect to the alleged wrong, it is simply fortuitous that the parties happened to have a contractual relationship." *Id.* at 1517. Coppock is mistaken. Citi did not coincidentally call a customer with a preexisting account to market a product unrelated to that account; it deliberately called a customer about a debt owed on her account. Coppock's claims based on those calls unquestionably relate to her account.

*Harrier v. Verizon Wireless Personal Communications*, No. 8:12–cv–1588–T–30AEP, --- F. Supp. 2d ----, 2012 WL 4525318 (M.D. Fla. Oct. 2, 2012), and *Pereira v. Santander Consumer USA, Inc.*, No. 11 C 8987, 2012 WL 4464893 (N.D. Ill. Apr. 2, 2012), are equally unavailing. In *Harrier*, the court held that Verizon could not compel arbitration of the plaintiffs' TCPA claim because "the plaintiffs' bankruptcy discharge rendered the parties' arbitration agreement unenforceable." 2012 WL 4525318, at *2. And in *Pereira*, the court held that the wife of the signatory to the arbitration agreement—who herself did not sign it—could not be forced to arbitrate her TCPA claims against the defendant, since none of the doctrines allowing a non-signatory to be bound to an arbitration agreement applied. 2012 WL 4464893, at *1.

Coppock cites to a treatise and several cases discussing arbitration agreements requiring arbitration of claims relating to *the agreement* to argue that "[t]ort claims may be compelled to arbitration **only** if they necessarily relate to and arise from the contract itself, and are, in essence,

a breach of contract claim pled as a tort." (Dkt. No. 47 at 16.) But the arbitration clause here is not limited to claims relating to the card agreement between Coppock and Citi; it subjects to arbitration "[a]ll [c]laims relating to your account, a prior related account, or our relationship." In any event, Coppock's complaint raises claims created by federal statute, and "[i]t is . . . clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991); *see Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987) ("Th[e] duty to enforce arbitration agreements is not diminished when a party bound by an agreement raises a claim founded on statutory rights."); *In re Thorpe Insulation Co.*, 671 F.3d 1011, 1020 (9th Cir. 2012) (same).

## C.   Whether The Arbitration Agreement Prevents Coppock From Effectively Vindicating Her Statutory Rights

"[C]laims arising under a statute designed to further important social policies may be arbitrated . . . so long as the prospective litigant effectively may vindicate his or her statutory cause of action in the arbitral forum." *Green Tree*, 531 U.S. at 90 (quotation marks and indications of alteration omitted). For example, "the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum," in which case the litigant's claims could not be subject to arbitration. *Id.* The party seeking to avoid arbitration bears the burden of showing that submitting her claims to arbitration would prevent her from effectively vindicating her statutory rights. *Id.* at 92.

Coppock has not met this burden. She simply asserts that "[t]he vindication principle enunciated in [*Green Tree* and other Supreme Court cases] remains intact." (Dkt. No. 47 at 20.) That is true, but Coppock does not explain how arbitration of *her* claims in *this case* would violate the vindication principle. In a final, giant, single-spaced footnote in 8-point font, Coppock argues that the arbitration agreement prevents her from vindicating her statutory rights because the terms of the agreement differ in several respects from the arbitration clause considered in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), which "ha[d] a

number of fee-shifting and otherwise pro-consumer provisions." *Coneff v. AT & T Corp.*, 673 F.3d 1155, 1159 (9th Cir. 2012). This argument relies on the mistaken belief that *Concepcion* established some sort of consumer-friendliness floor to arbitration agreements, below which the consumer cannot, as a matter of law, vindicate her statutory rights. Merely comparing the arbitration agreement here to that in *Concepcion* does not suffice to meet Coppock's heavy "burden of showing the likelihood of incurring" such "prohibitive expense[s]" in conjunction with arbitrating her claims that she is effectively prevented from vindicating her TCPA and FDCPA rights. *Green Tree*, 531 U.S. at 92; *see, e.g.*, *Livingston v. Assocs. Fin., Inc.*, 339 F.3d 553, 557 (7th Cir. 2003) (reversing denial of motion to compel arbitration where "[plaintiffs] have not offered any specific," "individualized . . . evidence of arbitration costs that they may face in this litigation, prohibitive or otherwise, and have failed to provide any evidence of their inability to pay such costs"). Indeed, that the arbitration agreement here requires Citi to reimburse the initial filing fee if the claimant prevails, to pay the fees and costs for the first day of the hearing, to advance or reimburse the filing and other fees under certain circumstances, and to pay attorneys' fees and expenses if allowed by applicable law and determined by the arbitrator (Dkt. No. 44 Ex. 15 at 15–16), and that Citi has agreed, pursuant to the agreement, to advance Coppock's portion of the arbitration fees (Dkt. No. 53 at 13), call seriously into question Coppock's claim that requiring her to arbitrate her claims on an individual basis effectively deprives her of them. *See, e.g.*, *Cayanan*, 2013 WL 784662, at *18–19 (addressing identical argument and holding Citi arbitration provisions did not prevent plaintiffs from vindicating their TCPA rights); *cf., e.g.*, *Guerrero*, 2012 WL 7683512, at *6 (identical Citi arbitration agreement, "[a]lthough not as consumer friendly as the arbitration provision addressed in *Concepcion*, . . . is not substantively unconscionable").

### D.    Whether The Arbitration Agreement Is Unconscionable

An "arbitration clause[] . . . [may be] unenforceable under state common law principles [of unconscionability] that are not specific to arbitration and [are not] pre-empted by the FAA."

1   *Marmet Health Care Ctr., Inc. v. Brown*, 132 S. Ct. 1201, 1204 (2012) (per curiam). Coppock

2   argues that the arbitration agreement here is unconscionable.

3               **1.**       **Choice of Law**

4         Coppock assumes, without establishing, that Washington unconscionability law applies,

5   and then asserts in four lines of a footnote that, in any event, "Citibank's clause would be

6   unconscionable and void under S.D. [South Dakota] law." (Dkt. No. 47 at 21–22 & n.19.) As

7   discussed *supra*, South Dakota unconscionability law applies unless (1) applying South Dakota

8   law would be contrary to a fundamental policy of Washington, (2) Washington has a materially

9   greater interest than South Dakota in the unconscionability determination, and (3) Washington

10  would be the state of the applicable law in the absence of the forum selection clause.

11  Restatement (Second) of Conflict of Laws § 187(2). It is far from evident that all three of these

12  criteria are met, and Coppock advances no real argument that they are.[2] The Court thus applies

13  South Dakota unconscionability law. *See, e.g.*, *Cayanan*, 2013 WL 784662, at *14 (applying

14  South Dakota law to evaluate consciability of Citi arbitration agreement).

15               **2.**       **Analysis**

16         South Dakota law requires that a contract be both procedurally and substantively

17  unconscionable to be unenforceable. *Hoffman v. Citibank (South Dakota), N.A.*, 546 F.3d 1078,

18  1083 n.2 (9th Cir. 2008) (per curiam) (quoting *Nygaard v. Sioux Valley Hosps. & Health Sys.*,

19  731 N.W.2d 184, 195 (S.D. 2007)). The court "looks not only at the bargaining power between

20  the parties but also at the specific terms of the agreement"; it "focus[es] on both overly harsh or

21  one-sided terms . . . and how the contract was made (which includes whether there was a

22

23   ————————————————

24       [2] Under *Concepcion*, the Court cannot consider Washington's policy on
  unconscionability of class-action waivers—"fundamental" or not, and of "materially greater

25  interest" to Washington than South Dakota or not—in the § 187 analysis, since the FAA
  preempts that policy and precludes a court from taking it into account in conducting the

26  unconscionability analysis. *See Coneff*, 673 F.3d at 1160–61 ("*Concepcion* controls," and "the
  FAA preempts the Washington state law invalidating the class-action waiver . . . .").

1    meaningful choice) . . . ." *Nygaard*, 731 N.W.2d at 194–95 (quotation marks omitted).

2          Coppock's procedural unconscionability argument rests entirely on the false premise that

3    "[s]tandardized, adhesive contracts drafted by the stronger party are procedurally

4    unconscionable . . . ." (Dkt. No. 47 at 24.) As the South Dakota Supreme Court has explained,

5    "simply because [a] contract is standardized and preprinted" does not mean that, "ipso facto, it is

6    unenforceable as a contract of adhesion." *Rozeboom v. Nw. Bell Tel. Co.*, 358 N.W.2d 241, 245

7    (S.D. 1984); *see Concepcion*, 131 S. Ct. at 1750 ("[T]he times in which consumer contracts were

8    anything other than adhesive are long past."); *Cicle v. Chase Bank USA*, 583 F.3d 549, 555 (8th

9    Cir. 2009) ("These sorts of take-it-or-leave-it agreements between businesses and consumers are

10   used all the time in today's business world. If they were all deemed to be unconscionable and

11   unenforceable contracts of adhesion, or if individual negotiation were required to make them

12   enforceable, much of commerce would screech to a halt.").

13         Coppock has not shown a lack of meaningful choice here. The notice of change in terms

14   explicitly provided that Coppock could opt out by notifying Citi in writing, and that if she did so,

15   she could continue to use her card under the preexisting terms until the later of the end of her

16   membership year and the expiration date of her card. Coppock did not opt out, and nothing

17   stopped Coppock thereafter from closing her account at any time; indeed, shortly after she

18   started receiving the phone calls at issue in this case, she transferred her Citi card balance to a

19   different credit card company. (Dkt. No. 40 at 3 ¶ 2.4.) There is simply no evidence here of

20   procedural unconscionability. *See, e.g.*, *Cayanan*, 2013 WL 784662, at *14 (Citi arbitration

21   clause not procedurally unconscionable under South Dakota law where plaintiff "was given

22   [identical] realistic opportunity to opt out of arbitration"); *Guerrero*, 2012 WL 7683512, at *4–6

23   (same, under California law); *Circuit City Stores, Inc. v. Ahmed*, 283 F.3d 1198, 1199–1200 (9th

24   Cir. 2002) (no procedural unconscionability in large part because clause contained opt-out

25   provision); *compare, e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237,

26   252 (S.D.N.Y. 2005) (banks' arbitration clauses unconscionable where "banks possessed

1   information [relevant to the decision to opt out of the arbitration agreement] which they withheld

2   from their cardholders when they added the clause to their contracts"). Indeed, in a case

3   involving virtually identical facts—a Citibank card holder since 1994 who received the 2001

4   notice of change in terms and the message regarding the notice in her November 2001 billing

5   statement, and who did not opt out and continued to use her card—the Ninth Circuit "agree[d]

6   with the district court's conclusion that Citibank's class arbitration waiver [was] *not* procedurally

7   unconscionable under South Dakota Law . . . ." *Hoffman*, 546 F.3d at 1079–83 & n.2 (citing S.D.

8   Codified Laws § 54-11-10).

9        Because Coppock has not shown procedural unconscionability, and because a showing of

10   both procedural and substantive unconscionability is necessary to void the contract, the Court

11   need not—and does not—address Coppock's arguments that the agreement was substantively

12   unconscionable. *See Hoffman*, 546 F.3d at 1083 n.2 (because "Citibank's class arbitration waiver

13   is *not* procedurally unconscionable under South Dakota law," it "*is* enforceable if South Dakota

14   law controls"); *see, e.g.*, *Cayanan*, 2013 WL 784662, at *14 ("Because the Court finds the Thank

15   You Card arbitration agreement was not procedurally unconscionable, the Court's inquiry ends

16   here."); *Ahmed*, 283 F.3d at 1200 (declining to inquire into substantive unconscionability after

17   finding no procedural unconscionability).

18   **E.    Coppock's Motion To Compel Arbitration-Related Discovery**

19        A month and a half after both the deadline to complete arbitration-related discovery and

20   Coppock's filing of her response to Citi's motion to compel arbitration, and almost three weeks

21   after that motion noted for the Court's consideration, Coppock filed a motion to compel Citi to

22   provide "full responses" to her arbitration-related discovery requests (Dkt. No. 55 at 4). The

23   Court DENIES the motion. On November 2, 2012, the parties submitted a joint status report

24   requesting that the Court set a deadline of February 1, 2013 for "Completion of Limited

25   discovery on Motion to Compel Arbitration," followed by a deadline of February 8, 2013 for

26   Coppock to file her response to Citi's motion to compel arbitration. (Dkt. No. 38 at 2.) The Court

1   granted that request on December 7, 2012. (Dkt. No. 42.) Citi served Coppock with its responses

2   to her arbitration-related discovery requests by the deadline. (Dkt. No. 55 at 3.) Coppock now

3   objects that, "[b]ecause the responses of Defendants to the written discovery [requests] were

4   served [on Coppock] only a week before [her] Opposition to the Motion to Compel Arbitration

5   was due, and because Defendants objected to and declined to respond to most of the discovery,

6   Plaintiff filed her Opposition without the benefit of facts which could support her Opposition."

7   (*Id.*) But Coppock explicitly stipulated to having only a week between completion of arbitration-

8   related discovery and the deadline for filing her response to Citi's motion to compel arbitration.

9   And if Coppock believed that Citi's responses to her discovery requests were inadequate, the

10  time to object was when she received those responses—*before* she filed her opposition to Citi's

11  motion. Coppock's motion is DENIED.

12  **III.   CONCLUSION**

13      For the foregoing reasons, the Court GRANTS Citi's motion to compel arbitration (Dkt.

14  No. 43), DENIES Coppock's motion to compel "full responses to all of the discovery," and for

15  leave to file a supplemental brief in support of her opposition to Citi's motion to compel

16  arbitration (Dkt. No. 55), and STAYS this case pending arbitration. *See* 9 U.S.C. § 3. The Clerk

17  is respectfully directed to STATISTICALLY CLOSE this case.

18      DATED this 22nd day of March 2013.

19

20

21

22

23

24

25  John C. Coughenour
    UNITED STATES DISTRICT JUDGE

26

ORDER
PAGE - 16